Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ED J. HERSHEWE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOYY INC. f/k/a YY, INC., DAVID XUELING LI, BING JIN, and ERIC HE,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiff Ed J. Hershewe ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding JOYY Inc. f/k/a YY, Inc. ("JOYY" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded JOYY securities between April 28, 2016 and November 18, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered, the subsequent damages took place in this judicial district.

6. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

8. Defendant JOYY, through its subsidiaries, purports to operate a social media platform in the People's Republic of China and internationally. The Company describes itself as operating live streaming platforms, including YY Live, an interactive and comprehensive live streaming social media platform offering music and dance shows, talk shows, outdoor activities, and sports and anime; Bigo Live, which enables users to live stream their specific moments and talk live with each other; and Huya, a game live streaming platform. It also operates short-form video platform, such as Likee, a short-form video social platform that produces, uploads, views, shares, and comments on short-form videos on a daily basis. The Company was originally known as YY, Inc., and changed its name to JOYY, Inc. on December 20, 2019.

9. The Company is incorporated in the Cayman Islands and its head office is located at Building B-1, North Block of Wanda Plaza No. 79 Wanbo Er

2

Road, Nancun Town, Panyu District, Guangzhou 511442, China. JOYY's American Depository Receipts ("ADRs") trade on the NASDAQ exchange under the ticker symbol "YY."

10.    Defendant David Xueling Li ("Li") co-founded the Company and has served as the Company's Chief Executive Officer ("CEO") and Chairman during the Class Period.

11.    Defendant Bing Jin ("Jin") has served as the Company's Chief Financial Officer ("CFO") since May 2017.

12.    Defendant Eric He ("He") served as the Company's CFO from August 2011 until May 2017.

13.    Defendants Li, Jin, and He are collectively referred to herein as the "Individual Defendants."

14.    Each of the Individual Defendants:

    (a)    directly participated in the management of the Company;

    (b)    was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)    was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

3

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

18.     On April 28, 2016, the Company, then called YY, Inc., filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2015 (the "2015 20-F"). The 2015 20-F was signed by Defendant Li. Attached to the 2015 20-F were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Li and He attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.     The 2015 20-F stated the Company's revenues and internet value-added service ("IVAS") revenues as follows, in pertinent part:

**Net Revenues**. Our net revenues increased by 60.3% from RMB3,678.4 million in 2014 to RMB5,897.2 million (US$910.4 million) in 2015. This increase was primarily due to the increased contribution of revenues from online music and entertainment and our online dating revenues as well as other sources including Huya broadcasting and membership program, partially

4

offset by a decrease in our online game revenues.

**IVAS revenues**.   Our IVAS revenues, which consisted of revenues from online music and entertainment, online games, online dating as well as other sources, increased by 60.3% from RMB3,531.0 million in 2014 to RMB5,661.0 million (US$873.9 million) in 2015. The overall increase primarily reflected an increase in the number of paying users and, to a lesser extent, an increase in ARPU. Our number of paying users increased from approximately 4.9 million in 2014 to 7.2 million in 2015. Our ARPU for IVAS increased from RMB726.0 in 2014 to RMB783.3 (US$120.9) in 2015. The increase in paying users and ARPU were primarily due to (a) our ability to offer new and attractive products and services that allow us to monetize our platform; (b) our ability to attract and retain a large and engaged user base through hosting an increasing number of events and activities; and (c) our ability to attract third party game developers, third party licensee operators, service providers and certain popular performers and channel owners.

Revenues from online music and entertainment increased by 57.4% from RMB2,109.5 million for 2014 to RMB3,320.1 million (US$512.5 million) for 2015. In addition to the increase in the number of paying users and ARPU, the increase in revenues from online music and entertainment was also due to the increasing popularity of online music and entertainment. Our paying users for online music and entertainment increased from approximately 2,964,000 for 2014 to 4,761,000 for 2015. The increasing popularity of online music and entertainment is primarily due to the increased number of activities we hosted.

20.     The 2015 20-F described the factors affecting revenues from IVAS as follows:

*IVAS revenues.*   We generate IVAS revenues from (i) the sales of in-channel virtual items used on our online music and entertainment channels, (ii) the sales of in-game virtual items used for games developed by us or by third parties under revenue-sharing arrangements on our platform and (iii) other revenues, including in-channel virtual items used for online dating and live game broadcasting and

5

membership subscription fees. Users access channels and play online games free of charge, but are charged for purchases of virtual items.

The most significant factors that directly affect our IVAS revenues include the increase in the number of our paying users and ARPU:

- *The number of paying users.* We had approximately 3.2 million, 4.9 million and 7.2 million paying users in 2013, 2014 and 2015, respectively. We calculate the number of paying users during a given period as the cumulative number of registered user accounts that have purchased virtual items or other products and services on our platform at least once during the relevant period. We were able to achieve an increase in the number of paying users primarily due to a larger active user base and a higher conversion ratio of active users to paying users, and we expect that the number of our paying users will continue to grow in the future as we expand our services and products offerings and further monetize our existing platform.

- *ARPU.* Our ARPU for IVAS was approximately RMB525.2, RMB726.0 and RMB783.3 (US$120.9) in 2013, 2014 and 2015, respectively. ARPU is calculated by dividing our total revenues from IVAS during a given period by the number of paying users for that period. As we begin to generate revenues from an increasing variety of IVAS, our ARPU may fluctuate from period to period due to the mix of IVAS purchased by our paying users.

Other significant factors that directly or indirectly affect our IVAS revenues include:

- our ability to increase our popularity by offering new and attractive products and services that allow us to monetize our platform;

- our ability to attract and retain a large and engaged user base; and

6

- our ability to attract and retain third party game developers, third party licensee operators, service providers and certain popular performers and channel owners.

We expect that the portion of our revenues from IVAS derived from the sales of non-game virtual items and services will continue to increase as we capitalize on monetization opportunities. We create and offer to users virtual items that can be used on various channels. Users can purchase consumable virtual items from us to show support for their favorite performers or time-based virtual items that provide users with recognized status, such as priority speaking rights or special symbols on the music and entertainment channels. The percentage of our total net revenues attributable to virtual items sold on our online music and entertainment channels was 46.8%, 57.3%, and 56.3% in 2013, 2014 and 2015.

21.    The 2015 20-F stated the following concerning the Company's stake in Bigo:

In October 2014, we entered into an agreement to inject our free voice-over IP service, Weihui, into Bigo Inc. or Bigo, a company set up and which was then controlled by our chief executive officer, Mr. David Xueling Li. Following two independent third-party valuation assessments and a capital injection from other investors of Bigo, including Mr. Li, we retained a 27.8% ownership stake in Bigo. We had paid daily operating expenses of RMB61.0 million and 95.3 million (US$14.7 million) on behalf of Bigo in 2014 and 2015, respectively.

22.    According to the 2015 20-F, "[a]s of December 31, 2015, [the Company's] subsidiaries, VIEs, and VIE's subsidiaries located in the PRC held cash and cash equivalents in the amount of RMB403.7 million (US$62.3 million).."

23.    On April 20, 2017, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2016 (the "2016 20-F"). The 2016

7

20-F was signed by Defendant Li. Attached to the 2016 20-F were SOX certifications signed by Defendants Li and He attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24.     The 2016 20-F stated the Company's revenues and live streaming revenues as follows:

> **Net Revenues**. Our net revenues increased by 39.1% from RMB5,897.2 million in 2015 to RMB8,204.1 million (US$1,181.6 million) in 2016. This increase was primarily driven by the increase in live streaming revenues.

> **Live streaming revenues**. Our live streaming revenues, which consisted of revenues from YY Live platform and Huya broadcasting platform, increased by 54.8% from RMB4,539.9 million in 2015 to RMB7,027.2 million (US$1,012.1 million) in 2016. The overall increase was primarily caused by an increase in the number of paying users from approximately 5.8 million in 2015 to 11.0 million in 2016, but was partially offset by ARPU decreased from RMB780.5 in 2015 to RMB637.8 (US$91.9) in 2016. The increase in paying users were primarily due to (a) our ability to offer new and attractive products and services that allow us to monetize our platforms; (b) our ability to attract and retain a large and engaged user base through hosting an increasing number of events and activities; and (c) our ability to attract certain popular performers and channel owners.

25.     The 2016 20-F described the factors affecting revenues from live streaming as follows:

> *Live streaming revenues.* We generate live streaming revenues from the sales of in-channel virtual items used on our live streaming platforms, including YY Live platform and Huya broadcasting platform. Users access content on our platforms free of charge, but are charged for purchases of virtual items.

> The most significant factors that directly affect our live streaming revenues include the increase in the number of our paying users and ARPU:

8

- *The number of paying users.* We had approximately 3.4 million, 5.8 million and 11.0 million paying users in 2014, 2015 and 2016, respectively for our live streaming services. We calculate the number of paying users during a given period as the cumulative number of registered user accounts that have purchased virtual items or other products and services on our live streaming platform at least once during the relevant period. We were able to achieve an increase in the number of paying users primarily due to a larger active user base and a higher conversion ratio of active users to paying users, and we expect that the number of our paying users will continue to grow in the future as we expand our services and products offerings and further monetize our existing platform.

- *ARPU.* Our ARPU for live streaming was approximately RMB726.7, RMB780.5 and RMB637.8 (US$91.9) in 2014, 2015 and 2016, respectively. ARPU is calculated by dividing our total revenues from live streaming during a given period by the number of paying users for our live streaming services for that period. As we begin to generate revenues from an increasing variety of live streaming services, our ARPU may fluctuate from period to period due to the mix of live streaming services purchased by our paying users.

Other significant factors that directly or indirectly affect our live streaming revenues include:

- our ability to increase our popularity by offering new and attractive contents, products and services that allow us to monetize our live streaming platform;

- our ability to attract and retain a large and engaged user base; and

9

- our ability to attract and retain certain popular performers, channel owners, professional game playing team and commentators.

We expect that the portion of our revenues from live streaming derived from the sales of virtual items and services will continue to increase as we capitalize on monetization opportunities. We create and offer to users virtual items that can be used on various channels. Users can purchase consumable virtual items from us to show support for their favorite performers or time-based virtual items that provide users with recognized status, such as priority speaking rights or special symbols on the music and entertainment channels.

26.     The 2016 20-F stated the following concerning the Company's stake in Bigo:

In October 2014, we entered into an agreement to inject our free voice-over IP service, Weihui, into Bigo Inc. or Bigo, a company set up and which was then controlled by Mr. David Xueling Li. Following two independent third-party valuation assessments and a capital injection from other investors of Bigo, including Mr. Li, we retained a 27.8% ownership stake in Bigo. We had paid daily operating expenses of RMB61.0 million, RMB95.3 million and 53.6 million (US$7.7 million) on behalf of Bigo in 2014, 2015 and 2016, respectively.

27.     According to the 2016 20-F, "[a]s of December 31, 2016, [JOYY's] subsidiaries, VIEs, and VIE's subsidiaries located in the PRC held cash and cash equivalents in the amount of RMB1,531.1 million (US$220.5 million)."

28.     On April 26, 2018, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2017 (the "2017 20-F"). The 2017 20-F was signed by Defendant Li. Attached to the 2017 20-F were SOX certifications signed by Defendants Li and Jin attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

29.     The 2017 20-F stated the Company's revenues and live streaming

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

revenues as follows:

**Net Revenues**. Our net revenues increased by 41.3% from RMB8,204.1 million in 2016 to RMB11,594.8 million (US$1,782.1 million) in 2017. This increase was primarily driven by the increase in live streaming revenues.

**Live streaming revenues**. Our live streaming revenues, which consisted of revenues from YY Live platform and Huya platform, increased by 51.9% from RMB7,027.2 million in 2016 to RMB10,671.0 million (US$1,640.1 million) in 2017. The overall increase was primarily caused by increases in the number of paying users from approximately 11.0 million in 2016 to 16.6 million in 2017 and ARPU from RMB637.8 to RMB643.2 (US$98.9) in 2017. The increase in paying users were primarily due to (a) our ability to offer new and attractive products and services that allow us to monetize our platforms; (b) our ability to attract and retain a large and engaged user base through hosting an increasing number of events and activities; and (c) our ability to attract certain popular performers and channel owners.

30.     The 2017 20-F described the factors affecting revenues from live streaming as follows:

*Live streaming revenues*. We generate live streaming revenues from the sales of in-channel virtual items used on our live streaming platforms, including YY Live platform and Huya platform. Users access content on our platforms free of charge, but are charged for purchases of virtual items.

The most significant factors that directly affect our live streaming revenues include the increase in the number of our paying users and ARPU:

• *The number of paying users.* We had approximately 5.8 million, 11.0 million and 16.6 million paying users in 2015, 2016 and 2017, respectively for our live streaming services. We calculate the number of paying users during a given period as the cumulative number of registered user accounts that have purchased virtual items or other products and services on our live

11

streaming platform at least once during the relevant period. We were able to achieve an increase in the number of paying users primarily due to a larger active user base and a higher conversion ratio of active users to paying users, and we expect that the number of our paying users will continue to grow in the future as we expand our services and products offerings and further monetize our existing platform.

- *ARPU.* Our ARPU for live streaming was approximately RMB780.5, RMB637.8 and RMB643.2 (US$98.9) in 2015, 2016 and 2017, respectively. ARPU is calculated by dividing our total revenues from live streaming during a given period by the number of paying users for our live streaming services for that period. As we begin to generate revenues from an increasing variety of live streaming services, our ARPU may fluctuate from period to period due to the mix of live streaming services purchased by our paying users.

Other significant factors that directly or indirectly affect our live streaming revenues include:

- our ability to increase our popularity by offering new and attractive contents, products and services that allow us to monetize our live streaming platform;

- our ability to attract and retain a large and engaged user base; and

- our ability to attract and retain certain popular performers, channel owners, professional game playing team and commentators.

We expect that the portion of our revenues from live streaming derived from the sales of virtual items and services will continue to increase as we capitalize on monetization opportunities. We create and offer to users virtual items that can be used on various channels. Users can purchase consumable virtual items from us to show support for their favorite performers or time-based virtual items that provide users with recognized status, such as priority speaking rights or special symbols on the music and entertainment channels.

12

31.    The 2017 20-F stated the following concerning the Company's stake in Bigo:

> In October 2014, we entered into an agreement to inject our free voice-over IP service, Weihui, into Bigo Inc. or Bigo, a company set up and which was then controlled by Mr. David Xueling Li. Following two series of capital injection from other investors of Bigo in 2015 and 2017, including Mr. Li, we retained a 21.6% ownership stake in Bigo. We had paid daily operating expenses of RMB95.3 million, RMB53.6 million and 28.4 million (US$4.4 million) on behalf of Bigo in 2015, 2016 and 2017, respectively.

32.    According to the 2017 20-F, "[a]s of December 31, 2017, [the Company's] subsidiaries, VIEs, and VIE's subsidiaries located in the PRC held cash and cash equivalents in the amount of RMB1,622.9 million (US$249.4 million)."

33.    On March 5, 2019, the Company announced in a press release that it had completed its acquisition of Bigo. The release stated, in pertinent part:

> GUANGZHOU, China, March 05, 2019 (GLOBE NEWSWIRE) -- YY Inc. (NASDAQ: YY) ("YY" or the "Company"), a leading live streaming social media platform in China, today announced its recent acquisition of the remaining approximately 68.3% of all the issued and outstanding shares of Bigo Inc ("Bigo") from the other shareholders of Bigo, including Mr. David Xueling Li, Chairman and acting CEO of YY, for an aggregate purchase price of US$1,452,778,383, comprising of US$343,061,583 in cash, 38,326,579 Class B common shares of YY issued to Mr. Li and 313,888,496 Class A common shares of YY issued to Mr. Li and other selling shareholders of Bigo. Prior to the transaction, the Company owned approximately 31.7% of all the issued and outstanding shares of Bigo on a fully diluted and as-converted basis. Mr. Li's total voting power in YY remains largely the same before and after the transaction.  The amount and form of the purchase price was discussed and agreed upon between YY and all the selling shareholders of Bigo in the recent months. YY negotiated other terms of the transaction with the shareholders of Bigo unrelated to YY. The transaction was approved by the independent audit committee of

YY's board of directors, which considered the arms length negotiation background as well as the fairness analysis conducted by its advisor China Renaissance Securities (Hong Kong) Limited, and was approved by YY's board of directors. The transaction was completed today after satisfaction of all the closing conditions. Lazard is acting as financial advisor to the Company.

Bigo is a fast-growing global tech company. Headquartered in Singapore, Bigo owns BIGO LIVE, a leading global live streaming platform excluding China, LIKE, a leading short form video social platform worldwide, and other social apps. Bigo has created a video-based online community for global young generation users. It has established footprints with a strong presence in South-Eastern Asia, Southern Asia, the Middle East and America, paving the way for further global expansion.

Mr. David Xueling Li, Chairman and acting Chief Executive Officer of YY, stated, "We are very excited to announce the completion of the acquisition of Bigo. It is an important milestone for YY group which demonstrated our confidence and commitment to the globalization strategy. Bigo has delivered both rapid user growth and significant monetization progress in 2018, making it one of the fastest growing internet companies worldwide. While BIGO LIVE is consolidating its leadership in entertainment live streaming market outside China, LIKE also experiences tremendous user growth and user time spent increase in short form video market. The combination of YY's and Bigo's unparalleled businesses and services in both China and overseas will enable us to create enhanced live streaming content, expand our global footprint, and offer world-class user experiences for our global user community. As a result, we will be well positioned to become a world leading video-based social media platform."

34.    On April 26, 2019, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2018 (the "2018 20-F"). The 2018 20-F was signed by Defendant Li. Attached to the 2018 20-F were SOX certifications signed by Defendants Li and Jin attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

35.    The 2018 20-F stated the Company's revenues and live streaming revenues as follows:

> **Net revenues**. Our net revenues increased by 36.0% from RMB11,594.8 million in 2017 to RMB15,763.6 million (US$2,292.7 million) in 2018. This increase was primarily driven by the increase in live streaming revenues.

> **Live streaming revenues**. Our live streaming revenues, which consisted of revenues from YY Live platform and Huya platform, increased by 39.4% from RMB10,671.0 million in 2017 to RMB14,877.7 million (US$2,163.9 million) in 2018. The overall increase was primarily caused by increases in the number of paying users from 16.6 million in 2017 to 19.8 million in 2018 and ARPU from RMB643.2 in 2017 to RMB751.2 in 2018. The increase in paying users were primarily due to (a) our ability to offer new and attractive products and services that allow us to monetize our platforms; (b) our ability to attract and retain a large and engaged user base through hosting an increasing number of events and activities; and (c) our ability to attract certain popular performers and channel owners.

36.    The 2018 20-F described the factors affecting revenues from live streaming as follows:

> Live streaming revenues. We generate live streaming revenues from the sales of in-channel virtual items used on our live streaming platforms, including YY Live platform and Huya platform. Users access content on our platforms free of charge, but are charged for purchases of virtual items.

> The most significant factors that directly affect our live streaming revenues include the increase in the number of our paying users and ARPU:
> - The number of paying users. We had 11.0 million, 16.6 million and 19.8 million paying users in 2016, 2017 and 2018, respectively for our live streaming services. We calculate the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

number of paying users during a given period as the cumulative number of registered user accounts that have purchased virtual items or other products and services on our live streaming platform at least once during the relevant period.

- We were able to achieve an increase in the number of paying users primarily due to a larger active user base and a higher conversion ratio of active users to paying users, and we expect that the number of our paying users will continue to grow in the future as we expand our services and products offerings and further monetize our existing platform.

- ARPU. Our ARPU for live streaming was RMB637.8, RMB643.2 and RMB751.2 in 2016, 2017 and 2018, respectively. ARPU is calculated by dividing our total revenues from live streaming during a given period by the number of paying users for our live streaming services for that period. As we begin to generate revenues from an increasing variety of live streaming services, our ARPU may fluctuate from period to period due to the mix of live streaming services purchased by our paying users.

Other significant factors that directly or indirectly affect our live streaming revenues include:

- our ability to increase our popularity by offering new and attractive contents, products and services that allow us to monetize our live streaming platform;

- our ability to attract and retain a large and engaged user base; and

- our ability to attract and retain certain popular performers, channel owners, professional game playing team and commentators.

We expect that the portion of our revenues from live streaming derived from the sales of virtual items and services will continue to increase as we capitalize on monetization opportunities. We create and offer to users virtual items that can be used on various channels. Users can purchase consumable virtual items from us to show support for their

16

favorite performers or time-based virtual items that provide users with recognized status, such as priority speaking rights or special symbols on the music and entertainment channels.

37.     According to the 2018 20-F, "[a]s of December 31, 2018, [the Company's] subsidiaries, VIEs, and VIE's subsidiaries located in the PRC held cash and cash equivalents in the amount of RMB4,724.4 million (US$678.1 million)."

38.     The 2018 20-F stated the following concerning Bigo, in pertinent part:

In June 2018, we invested US$272 million in the Series D round of financing of Bigo as the lead investor. We were then an existing shareholder of Bigo and had become its largest shareholder after the Series D financing.  In March 2019, we completed the acquisition of the remaining 68.3% of equity interest in Bigo from the other shareholders of Bigo,  including Mr. David Xueling Li, our chairman of the board of directors and chief executive officer. Pursuant to the agreement, we paid US$343.1 million in cash and issued 38,326,579 Class B common shares to Mr. David Xueling Li and 313,888,496 Class A common shares to Mr. David Xueling Li and other selling shareholders of Bigo. As of the date of this annual report, we hold 100% shares of Bigo and started to consolidate Bigo from the date of the completion of the acquisition.

*          *          *

Bigo Live is a leading global live streaming platform focusing on markets outside of China. Bigo Live allows the users to live stream their specific moments, live talk with other users, make video calls and watch trend video. It also has features like music live house and cross-room PK. Bigo Live has presence in more than 150 countries as of December 31, 2018.

39.     The 2019 20-F stated the following concerning the number of monthly active users:

We currently offer live streaming services primarily through our YY Live platform and Huya platform in China. We also offer global services through Bigo and other products incubated by YY Live and Huya outside of China. YY Live and Huya together attracted 90.4

17

million mobile average monthly active users in the fourth quarter of 2018, a 18.1% increase from the same period of 2017. Bigo attracted 59.4 million mobile average monthly active users for live streaming and short-form video services in the fourth quarter of 2018.

40.     On April 27, 2020, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2019 (the "2019 20-F"). The 2019 20-F was signed by Defendant Li. Attached to the 2019 20-F were SOX certifications signed by Defendants Li and Jin attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

41.     The 2019 20-F stated the Company's revenues and live streaming revenues as follows:

> **Net revenues**. Our net revenues increased by 62.2% from RMB15,763.6 million in 2018 to RMB25,576.2 million (US$3,673.8 million) in 2019. This increase was primarily driven by the increase in live streaming revenues and the contribution from Bigo's consolidation.
> **Live streaming revenues**. Our live streaming revenues increased by 61.5% from RMB14,877.7 million in 2018 to RMB24,028.3 million (US$3,451.4 million) in 2019. The overall increase was primarily caused by (i) the continued live streaming revenues growth in YY and Huya segments, amounting to RMB4,588.9 million (US$659.2 million), driven by user growth; and (ii) the contribution from the consolidation of Bigo segment, amounting to RMB4,561.8 million (US$655.3 million).

42.     The 2019 20-F described the factors affecting revenues from live streaming as follows:

> Live streaming revenues. We generate live streaming revenues from the sales of in-channel virtual items used on our live streaming platforms. Users access content on our platforms free of charge, but are charged for purchases of virtual items.

The most significant factors that directly affect our live streaming revenues include the increase in the number of our paying users and ARPU. Our management regularly monitor these operating metrics, which are important and direct performance indicators, in managing our live streaming business and in making relevant operational and production decisions.

●    The number of paying users. Excluding Bigo's effects, we had 16.6 million, 19.8 million and 23.8 million paying users in 2017, 2018 and 2019, respectively for our live streaming services. We calculate the number of paying users during a given period as the cumulative number of registered user accounts that have purchased virtual items or other products and services on our live streaming platforms at least once during the relevant period. We were able to achieve an increase in the number of paying users primarily due to a larger active user base and a higher conversion ratio of active users to paying users.
●    ARPU. Excluding Bigo's effects, our ARPU for live streaming was RMB643.2, RMB751.2 and RMB818.9 in 2017, 2018 and 2019, respectively. ARPU is calculated by dividing our total revenues from live streaming during a given period by the number of paying users for our live streaming services for that period. As we begin to generate revenues from an increasing variety of live streaming services, our ARPU may fluctuate from period to period due to the mix of live streaming services purchased by our paying users.

Other significant factors that directly or indirectly affect our live streaming revenues include:

●    our ability to increase our popularity by offering new and attractive contents, products and services that allow us to monetize our live streaming platform;
●    our ability to attract and retain a large and engaged user base; and
●    our ability to attract and retain certain popular performers, channel owners, professional game playing team and commentators.

19

We create and offer to users virtual items that can be used on various channels. Users can purchase consumable virtual items from us to show support for their favorite performers or time-based virtual items that provide users with recognized status, such as priority speaking rights or special symbols on the music and entertainment channels.

43.     According to the 2019 20-F, "[a]s of December 31, 2019, [JOYY's] subsidiaries, VIEs, and VIE's subsidiaries located in the PRC held cash and cash equivalents in the amount of RMB2,156.5 million (US$309.8 million)."

44.     The 2019 20-F stated the following concerning the number of monthly active users:

We are a leading global social media platform, offering users around the world a uniquely engaging and immersive experience across various video-based content categories, such as live streaming, short-form videos and video communication. Our global average mobile monthly active users reached 485.2 million in the fourth quarter of 2019, of which over 78.8% came from overseas markets. In the fourth quarter of 2019, we had 158.9 million of average mobile monthly active users of global live streaming services and 115.3 million of average mobile monthly active users of global short-form video services.

45.     The statements referenced in ¶¶ 18-44 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) JOYY dramatically overstated its revenues from live streaming sources; (2) the majority of users at any given time were bots; (2) the Company utilized these bots to effect a roundtripping scheme that manufactured the false appearance of revenues; (3) the Company overstated its cash reserves; (4) the Company's acquisition of Bigo was largely contrived to benefit corporate insiders;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

3
### THE TRUTH EMERGES

4
5
6
7
8
46.     On November 18, 2020, while the market was open, Muddy Waters Research published a report alleging that JOYY, among other things, had: (i) reported fraudulent revenue; (ii) component businesses that were a fraction of the size that it reports; and (iii) acquired BIGO as part of a scam that benefitted corporate insiders.

9
10
47.     The report alleged that up to 90% of JOYY's live revenue was fake, stating, in pertinent part:

11
12
13
We analyzed and sampled YY user data and gift revenue in three ways to estimate the percentage of FUs [Fake Users or bots] on YY Live and their associated revenue. We concluded that YY Live's gift revenue is approximately 90% fake using these three methods.

14
15
16
17
18
The first method was analyzing almost 100,000 Paying Users ("PUs") that XHL tracks. We found that we could cleanly class almost half of YY gifts by value as coming from YY-associated Fake Users ("FUs"). We did this by taking a core group of FUs in the data set bearing YY IP addresses and tracking the IMEI [mobile device ID] sharing that radiated out from that group.

19
20
21
22
23
24
However, we also found the remaining half of YY gift revenue to be largely fraudulent by performing granular investigative work to identify FUs. Our second FU identification method, which ran in this vein, consisted of randomly sampling 96 Wuhan-based PUs during the Chinese COVID-19 lockdown. We found that ~87.5% of these Wuhan PUs were apparent FUs. The third method, again granular, consisted of sampling 96 Modern Brothers PUs. As discussed above, the Modern Brothers sample indicated that ~97.9% were actually FUs.

25
26
27
We further verified our 90% fake revenue estimate by checking the revenue that leading channel owners reported to the SAIC against YY's claims. We found an 85.9% discrepancy between the revenue

28

21

YY asserted for the top five channel owners and the revenue in their China credit reports.

48.     Muddy Waters discovered that the financial statements for the top 5 JOYY live channel owners showed an 85.9% revenue discrepancy when compared with that of JOYY, stating in pertinent part:

> YY claims its top channel owners earned RMB 1.1 billion in revenues in 2018. We obtained these top channel owners' local credit reports, which showed that their combined revenues were only RMB 156.3 million, which indicates an 85.9% revenue overstatement.

> According to YY, Yujia, Huashe, Wudi, Chinablue, and IR were the top five channel owners by revenue in 2018. YY purports that they generated over RMB 1.1 billion in 2018 revenue. Below is a screen shot of a video on YY's website that makes this claim and states "2018! YY's 5 biggest channels draw more than RMB 1.1 billion in revenue".

> [image omitted]

> However, we obtained China credit reports for these channel owners revealing that their combined 2018 gross revenues were just RMB 156.3 million. This constitutes a shortfall of 85.9% compared to YY's claim. We are confident that the credit report revenue number is gross of payouts to performers based on reviews of PRC legal disputes in which performers were shown to be paid by channel owners, as well as our interviews with major channel owners.

49.     According to the report, JOYY engaged in a roundtripping scheme where the majority of the live performers' gift revenue came from themselves and JOYY-controlled bots:

> As we detail infra, we also discovered that the majority of three top YY Live performers' gift revenue comes from themselves and from YY-controlled bots. Another top performer receives a constant stream of gifts outside of her infrequent performances, mirroring the bot activity we saw on Modern Brothers' channel (discussed next). And four Top PUs that we examine below exhibited multiple indicia of FU

bot behavior such as YY-associated IP addresses and geographic IP switching. These findings bolster our ~90% fake revenue estimate for YY Live.

50.     Muddy Waters also examined JOYY's Chinese financial statements, and discovered numerous cash discrepancies compared to those filed with the SEC, stating in pertinent part:

> We obtained China credit reports for YY's onshore VIEs and compared them to YY's SEC filings, only to find numerous discrepancies. These differences amounted to hundreds of millions of RMB, including significant cash shortages in local financials as compared to what YY reported to the SEC. Such discrepancies, particularly in cash balances, are indicators of manipulation or fraud.
>
> For example, YY's 2018 SEC filings showed RMB 1.0 billion in long-term deposits, as shown infra. We believe this total is likely invented or greatly inflated, as the major YY onshore VIEs do not contain these same long-term deposits. A cursory comparison of the two sets of financial statements reveals this discrepancy.
>
> *     *     *
>
> Furthermore, we believe YY either transferred roughly RMB 1.326 billion to its WFOEs—the majority of which would have been transferred to its offshore WFOEs illegally—, or the cash simply does not exist.
>
> We calculate that out of YY's apparent WFOE cash balance of RMB 1.298 billion as of year-end 2018, the vast majority, approximately RMB 1.160 billion, would be offshore. However, given YY's SEC filings do not show material dividends or loans going offshore, we believe YY either violated Chinese capital controls in transferring the vast majority of the RMB 1.326 billion, or the RMB 1.160 billion in offshore WFOE cash balance is fake.

51.     Muddy Waters examined the Company's acquisition of Bigo, and determined that the majority of Bigo's revenue was fraudulent and the acquisition was designed to enrich Defendant Li:

23

We believe YY's 2010 buyout of Bigo for $1.45 billion in cash and stock was a scheme to bilk investors by buying another fraudulent company from the chairman.71 We obtained local Singapore filings for Bigo, which showed that YY, and not David Li, founded Bigo in the first place: Bigo was only transferred later to Chairman Li later. We also found that Bigo retroactively added mainland China revenues that we believe to be largely fraudulent to make Bigo seem like a larger acquisition for YY—and justify a larger payday for Chairman Li.

We believe that Bigo was set up to scam investors from inception. Since 2015, management has been misleading investors, telling the public that David Li set up and controls Bigo. However, this is a lie: Singapore filings show that Bigo Technology Pte. Ltd. was incorporated on September 11, 2014 with only one shareholder, YY's BVI entity, Duowan Entertainment Corp.

*        *        *

YY's Bigo acquisition was the culmination of a scam that unfolded over several financing rounds while ultimately being funded with a substantial portion of YY's 2017 secondary offering.75 Much of the acquisition consideration was paid directly to the Chairman in the form of both cash and stock. 38,326,579 Class B common shares of YY worth approximately $156.1 million were issued to David Li.

Additionally, he likely received a portion of the $343.1 million cash consideration as well as some of the 313.9 million class A common shares in YY. 76 YY also used this giant payout to insiders to book fair massive value gains in 2018 and 2019, generating sizable paper profits.

*        *        *

As a crowning revenue inflation achievement for David Li's checkbook, Bigo continually hid the fact that one-third of its business at the time of acquisition came not from overseas, but from mainland China. We believe this mainland revenue to be almost entirely fake, as detailed below. Further, we believe these PRC revenues fattened up Bigo with fictitious sales so that the business could fetch a higher acquisition price for the benefit of Chairman Li's (improperly reported) equity interest.

*        *        *

Three country executives at Bigo matter-of-factly confirmed to us that the majority of Bigo users are fake, with the allocation of bots being

24

directed by AI run from Bigo's headquarters in Singapore or YY's headquarters in Guangzhou.

\* \* \*

Bigo also has a mainland Chinese business that it does not discuss in its earnings calls and attempts to bury inside its annual filings. We believe it avoids mentioning the PRC business because it is essentially an empty box, as its apps show little to no real activity.

\* \* \*

Bigo's onshore revenue appears to be limited to the apps and investments held by the VIE Baiguoyuan, which should be substantially all derived from Hello and its sister apps. However, when our investigators spoke to YY's channel owners and virtual currency merchants, they encountered little knowledge of or familiarity with the PRC app Hello 语音. To date, we have found few signs that Hello has significant substance in terms of brand name, online presence, downloads, MAUs or revenues in China. As we lay out below, we doubt that Hello and its sister apps generate much, if indeed any, real revenue.

Our investigators performed primary diligence on Hello and found little current activity, cementing our belief that the app generates little revenue. Furthermore, Hello appears to have been set up by YY, not Bigo, as we found by analyzing disclosures by the app.

52.   On this news, JOYY's ADRs fell $26.53 per share, or 26.4%, to close at $73.66 per share on November 18, 2020, damaging investors.

53.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

54.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired JOYY securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of JOYY and its

25

subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, JOYY securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

56.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of JOYY;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the

26

statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused JOYY to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of JOYY securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

60.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- JOYY shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, JOYY filed periodic public reports;

- JOYY regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services;

- JOYY's securities were liquid and traded with sufficient volume during the Class Period; and

- JOYY was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

61.     Based on the foregoing, the market for JOYY securities promptly digested current information regarding JOYY from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

62.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of JOYY securities during the Class Period.

67.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of JOYY were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of JOYY, their control over, and/or receipt and/or modification of JOYY's allegedly materially misleading statements, and/or their associations with the Company which made them privy to

29

confidential proprietary information concerning JOYY, participated in the fraudulent scheme alleged herein.

68.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other JOYY personnel to members of the investing public, including Plaintiff and the Class.

69.     As a result of the foregoing, the market price of JOYY securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of JOYY securities during the Class Period in purchasing JOYY securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

70.     Had Plaintiff and the other members of the Class been aware that the market price of JOYY securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased JOYY securities at the artificially inflated prices that they did, or at all.

71.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

72.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of JOYY securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

73.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Individual Defendants participated in the operation and management of JOYY, and conducted and participated, directly and indirectly, in the conduct of JOYY's business affairs. Because of their senior positions, they knew the adverse non-public information about JOYY's misstatement of revenue and profit and false financial statements.

75.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to JOYY's financial condition and results of operations, and to correct promptly any public statements issued by JOYY which had become materially false or misleading.

76.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which JOYY disseminated in the marketplace during the Class Period concerning JOYY's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause JOYY to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of JOYY within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of JOYY securities.

77.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by JOYY.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.


## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 20, 2020              **THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS